I know you need some time to clear out. We're ready when you are, sir. Good morning. May it please the Court. Your Honors, the Board below committed reversible legal error by improperly weighing the evidence of obviousness and unrebutted objective indicia of non-obviousness. Specifically, the Board mischaracterized the problem to be solved in terms of the inventor's own solution, making a questionable showing of obviousness appear strong in hindsight. In the red brief at 23, HyperBranch notes that the evidence relied upon by Incept to establish industry praise, the feature in the publication of orthopedics this week, copied an Incept press release pretty much word for word. What value does that have in establishing industry praise? That person that did that was an industry analyst. He had a reputation in the industry. He adopted as his own the accurate description that Incept had put forth. Had he not believed it, he would not have printed it and put it out in his magazine. That's why he had the value. Did he testify? Please, say your Honor. I said, did he testify? No, Your Honor, he did not testify. So how do we know that? How do you know it? He had a reputation to uphold. Was there testimony about his reputation? No, there was not testimony about his reputation. And how can you say that to me? In the declaration of Dr. Sahani, which was submitted in support, he indicated that the analyst was very well known in the industry and had a reputation in the industry. And that he would not have adopted it as his own if he did not believe it. He printed this in an industry magazine that was accepted by the industry and viewed by many people there with respect. The fact that he accepted Incept's characterization was that he recognized that it was completely accurate. Now, as I was saying, additionally, in addition to… I mean, you're so far into speculation and lack of foundation, I'm not even going to ask any more questions about it. But if you can't answer me more fulsomely, that's fine. Well, I want to answer your question, Your Honor, but as I indicated, in addition to the industry praise… Take me to the page of the appendix where the affidavit is. The affidavit for Dr. Sahani, I believe, is at… I think it's 4490. It's in paragraph 17 of his declaration. I think you want 28. Maybe not. Is that correct? Is it paragraph 17? Paragraph 28, Your Honor, at 4484. Okay, where does that declaration state that the publisher was highly reputable or that he adopted the press release as his own? The declaration doesn't show it, but his article, which is attached to it, lists what he did. If you can look at the appendix at 4813, that is the article that we're referring to. Orthopedics This Week, a very reputable article. You're not answering my question. You know you're not answering my question. I don't see how, Your Honor. What you stated to me previously was that the declaration of your witness established sufficiently that the publisher was, A, highly reputable, and B, as a highly reputable person, adopted that press release. And I don't see it in here, and you're making a representation to me of that. Well, I believe it's there, Your Honor. I think it was well there. And additionally, you have the testimony of all the other neurosurgeons who testified in support of the FDA approval that this had fulfilled a long-felt need. They didn't say anything about coloration in their testimony. And that was another error by the board below. They didn't have to. According to this court's precedents set in the WBIP versus Kohler case, the same issue came up. It says the board had improperly discounted the evidence of industry praise, long-felt needs, saying that none of the evidence differentiated between a hydrogel with or without the visualization agent. In WBIP-Kohler, they said that proof of nexus is not limited to only when the objective evidence is tied to the supposedly new features of the invention. This court in Kohler categorically rejected the claim that objective evidence must be tied exclusively to claim elements that are not disclosed in a particular prior reference in order for the evidence to carry substantial weight. The key word there is exclusively, isn't it? Say again, Your Honor. I said the key word there is exclusively, is it not? No, the key word is it must be tied exclusively to the claim elements. That is correct. It only needs to be tied to the invention as a whole. And the question is, there's no question that the claims cover the Duracell product. But what was the novelty of this invention? It was all about visualization, was it not? The novelty of this invention was that it provided an effective dural sealant. It could be used in situ to prevent leakage of fluids and adhesions. It's the invention as a whole. It has nothing to do with visualization? The visualization allowed the person using it, the doctor, to be able to put on a thickness of a predetermined thickness. Right, isn't that what the essence of this invention is? Well, I hate to speak in terms of the essence of the invention, Your Honor. It was in solving the problem that the industry faced. But that had to do with the determining thickness. That's what this invention is geared to. It's geared towards introducing a dye, right? It isn't just introducing the dye, Your Honor. It is the whole combination of putting all these together and coming up with an effective dural sealant that effectively closes the tissue and prevents leakage. But the prior art had everything other than the insertion of this dye, this visualization, right? The prior art did not have everything. Rhe reads on every aspect except that, does it not? Isn't it Rhe that reads on every aspect except the dye? Rhe has all the components to the hydrogel except the dye. That is correct, Your Honor. But it did not have the visualization agent. You needed to have the visualization agent. That's right. They had to combine it with another piece of prior art, which the board did, right? And the art that they combined it to was art that was chemically different, all right, and different bioadhesives. And it was not known that you could take the colorants that they use to put it in a hydrogel being formed in-situ to be able to effectively seal the tissue. And its dramatically beneficial effect of being able to control the application of thickness to obtain a water-site seal was not appreciated prior to the invention by the inventors. In retrospect, in hindsight, if you form this question, as the board did, of merely looking to just how do we add a dye to hydrogel, that obviously appears simple. However, the genius of a lot of inventions is that in retrospect, all right, it may seem preordained, but you have to look to what the problem was that was being solved. There was a long-felt need out there for a sealant that could effectively seal the dura tissue, right? And this, despite the fact that the CoSeal, which is the prior art, the re-tissue, was commercially available years before the DuraSeal product, yet it didn't solve the problem. It still had the evidence of all that unmet need. Only after the inventors did their work and came up with a solution which had the visualization agent so that you could effectively seal the dura tissue in situ and create a water-site seal, that was only done after they did all the hard work of experimenting to show that you wouldn't have the problems caused by the unpredictability in this field. The invention was two-fold. It was discovery of the potential for the addition of a visualization agent to be markedly beneficial, and in the face of the unpredictability of the chemical and physiological arts, it was discovery that a colorant could be added without interference with the formation of the hydrogel in situ, without interfering with the quick gel time that was required, without causing problems such as toxicity or lack of biocompatibility. Now, the board erred in assuming that very small amounts of visualization agent needed to be added to the rehydrogels. The amount of visualization agent needed to be added to the hydrogel system was unknown and unpredictable at that time. BAS disclosed a broad range, going from 0.01% up to 50% by weight, and that typically higher concentrations were needed. The working examples in BAS typically were 50 times greater than the minimum concentration. Now, concentration of dye needed to visualize the hydrogel in situ and thereby control the thickness of the application to obtain the water-site seal could not be predicted. The extent to which the visualization agent would interfere with the intended hydrogel formation, either by a chemical reaction, by steric hindrance to the size of the bulk of the dyes, or because of low water solubility, or that it would slow the rate of gel formation, or increase the toxicity, or the lack of biocompatibility simply could not be predicted. The Board's conclusion of ordinary predictability and motivation to combine with a reasonable likelihood of success is especially egregious with respect to Claim 10. This requires that the hydrogel form within five seconds of contact. The Board took inconsistent positions with respect to ReEDS-500, disclosing biocompatible hydrogels and hydrogels that satisfy the five-second gel time. When considering biocompatibility, the Board found that the tetraamino PEG in ReEDS-500 would not be biocompatible. It would have to be modified to become marginally biocompatible with sulfur hydrogel PEG. However, when the Board relied on the tetraamino PEG in ReEDS-500 Table 6 as satisfying the five-second gel formation time, thus the Board relied on the same hydrogels for the fast gel time that the Board had said elsewhere in its opinion could not be categorized as being biocompatible. The Board attempted to justify this saying that one skilled in the art could have decreased gel formation times by adjusting the pH. Well, obviously this requires what one of the ordinary skilled in the art would have been motivated to do with an expectation of success, not what could have been done. The combination of the ReEDS-587 and methylene blue fails because it fails to consider the poor water solubility effect of the methylene blue. ReEDS itself specifically discloses that the addition of compounds having poor solubility impedes reaction times. One skilled in the art would not have a reasonable expectation that the ReEDS-587 and methylene blue would deal with a hydrogel suitable to coat the tissue and a suitable visualization agent, let alone within the five seconds required by Claim 10. I just want to let you know that you're into your rebuttal time. May it please the Court. The petition claims in this case cover a trivial improvement over the prior art, surgical tissue adhesives and sealants. The only point of novelty in the claims is the combination of an off-the-shelf, commercially available dye with a hydrogel that was known effective as a surgical tissue coating or sealant. But isn't that exactly the problem? It's an off-the-shelf glue. It's an off-the-shelf dye. And all of a sudden, when these inventors make this combination, put these components together, hadn't been done before, it turns out to displace everything else to achieve industry praise, sales, and all of the other indicia of success. If it were so obvious, what took so long? I mean, why were all these other inferior systems in use for so many decades if this was so obvious? Your Honor, the facts you describe are not the facts in this case. The facts in this case are that there's an express teaching in BAS and C that you can improve a surgical tissue adhesive or sealant by adding a dye to improve its visualization, to aid in its placement and gauging in its thickness. That express teaching was an express motivation to improve a hydrogel, such as the rehydrogels, in the same way that other polymeric tissue coatings had been improved. You ask about the praise in the record in this case. But this Court's precedents have made clear that praise and other secondary considerations evidence must be tied to what is both claimed and what's novel in the claims. And the merits of the invention were not addressed in any of the statements of praise or need. The statements in the record concerning praise and need go only to the watertight sealing characteristics of the hydrogel. And it's undisputed that the hydrogel, whether clear or colored, may be an effective watertight seal. The problem with INSEPT's evidence of non-obviousness in this case, as the Board correctly found, was that the evidence that was offered of praise and long-felt need went only to a watertight sealant. Now you ask why it was that there was success. It's important to keep in mind here that INSEPT sought approval for one indication, which is to seal the brain tissue, or dura, after surgery. Now, I agree the sealant is available, but that's not the accused product. That's what's being used or copied is the sealant combined with the dye, as these inventors taught. If the dye has nothing to do with it, why is it so essential in order to compete to include the dye? Your Honor, it's not essential. And that's the problem with INSEPT's evidence. In that case, why infringe? There's then a clear path to acting in this business without infringing. But the choice has been made, according to the record, to make the product that is explicitly taught in this patent. Well, Your Honor, with respect to the question of why infringe, the only issue before the Board, of course, since this is a PTAB case and out of an inter-party's review, was the obviousness of the claims. And on this record, we have undisputed evidence that the re-prior art references disclosed every limitation of the claims relating to hydrogels, and that BAS and C disclosed every limitation relating to color and expressly teach the combination. So the question here is, did the Board err in applying the law or in its fact findings? And what we have is a record where the only two issues that were left for INSEPT to argue, because it was such a strong obviousness case, were one, secondary considerations, and two, the issue of reasonable expectation of success. And the Board properly applied the law on both of those issues, and its fact findings are subject to deference by this court. And what the record shows is that on the key issues, there were five buckets of evidence offered regarding secondary considerations, and the Board found that the only one of those groupings of evidence that carried some weight of non-obviousness was the sales data. But it's important to keep in mind that at the point in time when those sales were generated, INSEPT was the only company on the market with an FDA-approved dural sealant. There was mention about the CoSeal product, and the question you posed was, well, why didn't CoSeal take those sales? CoSeal was approved for sealing vascular grafts for a completely different indication that dealt with vascular surgery and sealing up the stitch holes in veins and arteries after they had been patched up. And so CoSeal was on the market as a clear hydrogel sealant for a completely different purpose. The reason that CoSeal was not taking the dural sealing market was that they didn't have an FDA approval for that indication. And so the evidence in the case only shows some evidence of non-obviousness with respect to sales for a period in time when INSEPT was the only company on the market with an approved dural sealant. And this court has recognized that when a company is the only one on the market with an FDA approval, an evidence of 100% market share is not entitled to very much weight. Is that what you... Just one question. Doesn't the record say that for surgical use, FDA approval is not required? Doctors are allowed to use products off-label. And there is some evidence in the record that other things, such as fibrin glues and cyanoacrylate compounds, were used. It also is clear in the record that the prior art cyanoacrylate compounds that were used included products that were colored blue. And that's the C reference that involves a cyanoacrylate sealant that's colored blue. And so the fact of including a dye to improve the visualization of a surgical tissue sealant or coating is something that was well-established and was known as an improvement that was desirable to make. Now, I'd like to... Is your FDA approval argument what you mean when you talk about untethered barriers to entry and other information in page 16 of your red brief? Your Honor, the argument that we're making is that the key problem with the evidence that was offered by INSEPT, as found by the board at pages 55 to 57 of the appendix, was that the evidence that was offered other than sales only went to characteristics of a hydrogel without distinguishing between colored or uncolored. A hydrogel, whether clear or colored, provides a watertight seal. Establishing that there was a need for a watertight sealant is just establishing a need for the prior art re-products. It's undisputed that the prior art included hydrogel surgical sealants that were uncolored for other purposes. And this Court's precedents have acknowledged that when that's the case, whether they were on the market with an approval for the indication that INSEPT got is not the question that needs to be asked when the question of obviousness is addressed. I'd like to very briefly address and respond to each of the points that INSEPT's counsel has made. There was reference to the importance of the indication for dural sealing. I'd like to point out to the Court that none of the claims in this case recite or are limited to sealing the dura of the brain. The claims are very broad and only cover a preparation of a hydrogel that includes the hydrogel and the dye. Only in column 8, in fact, of the patent is there even a mention of one potential embodiment, which includes dural sealing. Turning to the predetermined thickness reference made by counsel for INSEPT, there are other claims in the patent that address the requirement of a particular thickness of application and discuss how the use of the dye can aid in that process. The claims here do not include that predetermined thickness limitation. There is a mention that the BAS and C dyes teach other chemically different tissue adhesives and sealants. That's inaccurate. BAS was found by the Board to expressly incorporate the NACEDUKE reference, and it's undisputed that NACEDUKE's fibrin glues were a type of a hydrogel. Moving on to the question of hindsight, as we've mentioned in the briefs, in a case such as this one where the Board made express findings that BAS and C expressly teach the improvement that's at issue here, that it was beneficial to add a dye to a surgical tissue sealant or adhesive, there isn't the problem with hindsight you might have in another case. And INSEPT has never been able to overcome that. Turning quickly to BAS, there was a mention that there was no starting point for BAS in terms of the concentration, that the range was too large. As mentioned in both the petition and in Dr. Loman's expert report, BAS claim 40 not only mentions methylene blue and indocyanine green, two of the three dyes that were relied upon by the Board and its findings of obviousness, but it claims that in a range of 0.01 to 10%. The BAS patent itself points the person of ordinary skill to use methylene blue and indocyanine green at the 0.01% concentration. Turning to Claim 10, I only heard argument, at least initially, about Re500. I'd like to remind the Court that the Re587 patent was indisputably biocompatible. It's important to note that the Board found all the claims invalid four ways, over four grounds. Two of the grounds were the Re587 reference, admittedly biocompatible, instantaneous gel time. That's undisputed. The Board reasonably found, based upon evidence, that a person of ordinary skill would expect success in adding a dye to an instantaneous gelling hydrogel of Re587 and that you'd easily get to a gel in less than five seconds. That's undisputed in the record. With respect to Re500, the only argument with respect to Claim 10 is the alleged bulkiness and low water solubility of methylene blue. That issue is not a basis for any finding of reversal because Dr. Mays, INSEPT's own expert, conceded on cross-examination that Aldrich Chemical Company, during the prior art period, sold aqueous solutions of methylene blue as a dye at concentrations of 0.05%. Five times the concentration that Bass says is a preferred concentration to add as a dye, particularly for methylene blue. There's no question Dr. Mays, INSEPT's expert, conceded that the aqueous solution you could buy for methylene blue was in a dropper bottle and you could put it into a solution that would turn the water blue. With respect to the question of steric hindrance or bulkiness, last issue I'd like to address, the board's fact findings here were quite clear. Dr. Lohmann, HyperBranch's expert, offered a calculation explaining that at Bass's concentration of 0.01%, the concentration of the electrophilic functional groups in the hydrogel precursor, the nucleophilic functional groups in the hydrogel precursor to the dye would be 1,000 to 1,000 to 1. And that even if you had some minor amount of steric hindrance, that the concentration of the functional groups was so much larger than the concentration of the dye that no person of ordinary skill would have any expectation that gel time would be slowed meaningfully or that there would be an interference problem with the gel formation. In response, Dr. Mays conceded on cross-examination several important things. First, he emphasized that steric hindrance was a major problem, but the board found that testimony was speculative, because while agreeing that concentration of the dye was important to consider, he conceded that he had not considered concentration effects in developing his opinions and the reason why was pretty plain on the record. If he had considered concentration effects, it would have been clear and he would have had to concede that at the very low concentrations necessary for a dye to color a hydrogel, there would be no interference, steric or otherwise. This is a case where the board, in a carefully reasoned 60-page opinion, methodically went through every issue, applied the law in accordance with this court's precedence, considered the totality of the evidence before reaching any decision on obviousness. There were no shortcuts here where the first three grand factors were used to establish a prima facie finding of obviousness. The board considered the totality of the evidence and on that totality, found in a reasoned, carefully and lengthy decision, that every single one of the claims was invalid four ways and every issue raised by INSEPT in this appeal raises a substantial evidence review question other than the very preliminary question of whether the board recited and applied the law correctly on the question of secondary considerations. The board's findings were well supported by evidence and are entitled to deference by this court. Thank you. Your Honor, first of all, the WBIP versus Kohler case was not followed by the board. That case says you have to consider the invention as a whole. All of the praise, all of the long-felt need was to Duracell as a whole. It was never praised as anything differentiated by saying that, hey, it's just because of the qualities of the hydrogel, such as the re-prior art that was out there. You have to look at the invention as a whole. It talked about Duracell, so it's improper for them to discount that. With regard to praise and long-felt need being commensurate with the scope of the claims, the NRA CHUP case that we cite says you don't have to have exact commensurate with the scope. In that case, they had claims going to crops. There was commercial success with regard to corns and soybeans and praise, and that was sufficient. With regard to the RE-587 and the methylene blue issue, you could have the aqueous solution of 0.05 that was for sale. RE itself says that when you have something which has poor solubility, such as the methylene blue, it affects the reaction times. Where is that in the record, please? Yes, Your Honor. If you look at our blue brief at page 43, we cite to where that is in the record. It has the specifics on that page as to the column and line numbers in the brief, where it said that specifically discloses additions of components having poor solubility impedes reaction times. You said re-mention methylene blue. I want to know where it is. No, re-talking about, it doesn't mention methylene blue. It says that ones with having poor solubility. Methylene blue doesn't necessarily have poor solubility. It comes in an aqueous solution, does it not? It can come in an aqueous solution, that's correct. But it is in the record that it does have poor solubility. That's set forth in the 034 patent itself. That's in the appendix at 97. And it's in our reply brief at 25 and footnote 36. Finally, this case affords the court an excellent opportunity to clarify the law and the treatment of objective addition of non-obviousness. To make clear that secondary considerations come second approach is improper as a matter of law. It's not, you shouldn't have an improper shortcut that converts three of the grand functions. Did you say we should clarify our law? Yes, I do, Your Honor. Well, don't you think, doesn't our law say we have to overturn our law? Because doesn't the law obviously allow, we've had hundreds of cases where you deal with the prima facie case of obviousness and then, of course, before you reach an ultimate conclusion, you go to the secondary considerations. So are you asking us to overturn all of those cases? You have to make it consistent out there that the secondary addition of non-obviousness is not a rebuttal. It is one of the four factors of BRAM and has to be considered before you arrive at the obviousness conclusion. In the blue brief, we told you... Did the board here consider the secondary considerations before it arrived to this conclusion of obviousness? That's quite clear that it did, right? Well, Your Honor, I would tend to disagree with that. If you look under the blue brief at page six, where we cited what Judge Solward said, he says there is a strong case of obviousness. Secondary considerations don't rebut that. All right. That was the way that they followed in determining... First of all, they made the mistake of characterizing... They did a secondary considerations analysis, did they not? They did do a secondary consideration. A flawed one because they didn't follow WBIP versus Kohler. They discounted the secondary considerations contrary to that precedent. Okay. We're out of time. Thank you. We thank both sides and the case is submitted. This case for argument is 18-2207, Allegrin v. Sanders.